IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAMUEL L. ENGLISH, )<br>  )<br>           Plaintiff, )<br>  )  Civil Action No. 06-19 Erie<br>  )<br>           v. )<br>  )<br>MICHAEL J. ASTRUE, )<br>Commissioner of Social Security,[1] )<br>  )<br>           Defendant. ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Samuel L. English, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. English filed an application for DIB on August 20, 2003, alleging disability since October 25, 2002, due to disintegrating disk disease, causing right-sided pain and weakness radiating from the neck through his extremities (Administrative Record, hereinafter "AR", 49-51; 62). His application was denied, and English requested a hearing before an administrative law judge ("ALJ") (AR 34-38). Following a hearing held on May 9, 2005, the ALJ found that English was not entitled to a period of disability or disability insurance under the Act (AR 17-25; 294-331). English's request for review by the Appeals Council was denied (AR 7-10), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny both motions and the matter will be remanded to the Commissioner for further proceedings.

---

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. 405(g), he is automatically substituted as the defendant in this case.

1

**I. BACKGROUND**

English was born on December 31, 1944 and was 60 years old on the date of the ALJ's decision (AR 49). He is a high school graduate and completed one year of college, with past relevant work experience as a bookkeeper, office manager and controller (AR 93).

Prior to his alleged disability date of October 25, 2002, English was treated by Marc Flitter, M.D., from 1995 until 2001 for neck pain and right extremity pain and weakness (AR 111-148). He underwent conservative therapy and in January 1996, Dr. Flitter reported that he was 90% improved from his initial complaint (AR 134). He returned to Dr. Flitter in November 1997 complaining of recurrent neck pain and left thumb numbness (AR 131). Dr. Flitter recommended a soft cervical collar, physical therapy and traction (AR 131). In January 1998, Dr. Flitter referred English for cervical facet injections since conservative treatment had failed (AR 120). In February 2001 English complained of neck pain and right arm pain (AR 111). Physical examination revealed symmetrical deep tendon reflexes of the upper and lower extremities, no clonus or Babinski sign, intact posterior column sensation, no weakness or atrophy, intact cranial nerves and negative Romberg sign (AR 111). Dr. Flitter noted that a February 17, 2001 MRI of English's spine demonstrated posterior disc bulging or spur formation at C3-4 through C6-7 with mild encroachment on the left side at C4-5, C5-6, and neuroforamina at C6-7 (AR 111, 158). Dr. Flitter recommended English undergo physical therapy and traction, and if no relief was obtained, then repeat epidural injections (AR 111).

English was also treated for neck pain by Ronald Martin, M.D. (AR 178-184). On April 4, 2003, Dr. Martin referred him to a neurosurgeon (AR 180).

English was evaluated by Steven Gilman, M.D., a neurosurgeon on April 17, 2003 (AR 200-201). English reported a history of neck pain radiating down his right arm for which he had undergone conservative treatment (AR 200). He reportedly had relief with physical therapy and injection therapy (AR 200). He indicated that his pain had kicked up again and he was again treated conservatively with not as much improvement (AR 200). English reported that he was

more miserable with weakness in his right leg radiating into his scapula and down into his arm (AR 200). Physical examination revealed intact cranial nerves, 5/5 strength in all muscle groups with the exception of slight triceps weakness, slow fine motor movements and slight weakness in his iliopsoas proximally in the lower extremity, brisk reflexes at the biceps, triceps, knees and 1+ at the ankles, mild Hoffmann signs, no pathological spread of reflexes, downgoing toes, slightly spastic gait, normal finger-to-nose testing and negative Romberg sign (AR 201). Dr. Gilman reported that English's neck motion was definitely limited, right-sided turning caused sharp pain radiating down his arm, left-sided turning caused neck pain and extension caused numbness and tingling in both arms (AR 201).

Dr. Gilman reviewed English's 1991 MRI and recent MRI of his cervical spine, and found there was progression of his disease (AR 201). He noted there was multi-level stenosis secondary to discs and osteophytes causing cord compression at the C4-5 and C5-6 level, and there was bilateral foraminal stenosis at the C6-7 level, worse on the right (AR 201). He formed an impression that English was symptomatic from the C7 radiculopathy and cervical myelopathy, and estimated that he needed decompression or risked becoming worse (AR 201). He recommended a three level anterior discectomy, decompression of his cord and fusion (AR 201).

On May 27, 2003, Dr. Gilman performed an anterior cervical decompression and fusion surgery of English's cervical spine (AR 195-198). Shortly thereafter on June 3, 2003, English presented to the emergency room complaining of bilateral elbow pain (AR 161). A CT scan of his cervical spine revealed normal postoperative appearance (AR 163). When seen by Dr. Gilman on June 5, 2003, English reported "good relief" of his pain and Dr. Gilman reported no new neurological deficits (AR 191).

Six weeks after his surgery, on July 7, 2003, Dr. Gilman reported that English was doing "very, very well" and "coming along nicely" (AR 188). He noted that he had fused nicely according to his x-rays (AR 188). Dr. Gilman recommended physical therapy to loosen him up and increase his shoulder strength (AR 188).

English underwent physical therapy from July 9, 2003 until July 22, 2003 at Keystone Rehabilitation (AR 172-177). English complained of neck stiffness, right upper extremity weakness and decreased right shoulder range of motion (AR 175). Therapist Mark Eberle opined that his rehabilitation potential was good (AR 175). At his remaining therapy sessions, English reported increased stiffness in his cervical spine, discomfort, right-sided weakness and numbness in his right hand (AR 173-174). At his final session on July 22, 2003, English continued to complain of knotting and tightness in the right shoulder and upper back region, stating he had difficulty with all activities (AR 172). Mr. Eberle noted that he had difficulty sitting and standing (AR 172). He recommended English return to Dr. Gilman before continuing therapy (AR 172).

An MRI of English's cervical spine conducted on July 28, 2003 revealed worsening central disc protrusion/herniation at the C3-4 level compared to the April 14, 2003 study (AR 206).

English returned to Dr. Martin on August 21, 2003 and reported no improvement in his shoulder pain (AR 178). Dr. Martin reported that he had spoken with Dr. Gilman who saw nothing wrong with his MRI taken the week before (AR 178). According to Dr. Martin, Dr. Gilman placed English back on a hard neck brace, and he continued to use a bone stimulator for bone growth three hours per day (AR 178). Dr. Martin advised him to continue taking Vioxx and follow up with Dr. Gilman (AR 178).

On September 16, 2003, Dr. Gilman wrote a letter to Theresa Wheeling, M.D., requesting that she examine English (AR 186-187). He described English's complaints of pain in his shoulder and neck, noting that he struggled with neck pain constantly and had trouble with extension (AR 186). However, he reported that English's neurological function had actually improved (AR 186). Likewise, he reported that a repeat MRI of his neck looked good and from C4 down to C7 he was "well decompressed" (AR 186). He noted that there was a question of some spondylosis at the C3-4 level, but there was no evidence of cord compression and his disc

was not "terribly degenerative" (AR 186).  Dr. Gilman opined that there was "no way" one spur at that level was causing English that much pain (AR 186).

English was evaluated by Dr. Wheeling on September 23, 2003 (AR 233-234).  He primarily complained of pain in his neck, shoulder, shoulder blade and arms, worse on the right than on the left (AR 233).  He further reported increased pain with activity (AR 233).  He stated that he was able to walk three to four miles a day post-surgery with a hard collar, but could now only walk one mile a day due to pain and shortness of breath (AR 233).  He claimed he could only sit for 35 to 45 minutes, stand or walk for the same period of time and was unable to drive far due to pain (AR 233).  On physical examination, Dr. Wheeling reported that English walked with a slow and guarded gait, was tender to palpation everywhere but had no weakness in his upper or lower extremities (AR 234).  Dr. Wheeling noted that English had the same pain complaints prior to his cervical surgery, and opined that his pain was likely caused by pre-existing fibromyalgia (AR 234).  She recommended conservative treatment such as massage and myofascial release (AR 234).

English was evaluated by Alexandra Hope, M.D. on October 14, 2003 pursuant to the request of the Commissioner (AR 212-217).  He relayed his past cervical surgery history and complained of constant aching in his neck and right shoulder which increased with any activity (AR 212).  He claimed that with any activity his entire right side felt like dead weight and he would drag his right foot (AR 212).  English reported that he was independent with all activities, other than an occasional need for help with shoe tying (AR 212).  He used a cane when walking on uneven terrain, was able to drive short distances, spent his time attending medical appointments and playing around on the computer for 15 to 20 minutes at a time and was able to write for approximately 15 minutes before his handwriting deteriorated (AR 212).

On physical examination, Dr. Hope reported that English dragged his lower right extremity as he walked, but was able to bend in a fluid manner to retrieve medical records from a nearby chair, arose well from a seated position and moved about without the assistance of a cane

(AR 213). He was able to heel and toe walk and perform a deep knee bend (AR 214). During range of motion and motor examination, Dr. Hope reported that English was tremulous and had an increased respiratory rate, and his movements were "frequently jerky," in a manner that would usually increase pain (AR 213).

Dr. Hope indicated that the etiology of English's complaints were unclear, since all medical history was taken from him and it was unclear what degree of cervical stenosis was present prior to surgery (AR 215). She found some of his movements on physical examination "puzzling," noting that they might be commonly seen in patients who were symptom magnifying, yet his verbal information appeared to be straightforward (AR 215).

Dr. Hope completed a medical source statement of English's ability to perform work-related physical activities, and opined that he could lift and carry ten pounds occasionally a "few times a day," stand and walk one to two hours a day with an assistive device for uneven terrain, sit for six hours with a sit/stand option and was limited in his pushing and pulling ability (AR 218). She further opined that English could never engage in postural activities, and should not engage in sustained or repetitive reading or computer usage, or sustained head positions as in computer usage or reading (AR 219).

English returned to Dr. Wheeling on November 11, 2003 for follow up (AR 232). He reportedly had undergone a pulmonary function test, a stress test and an EKG through his family physician and the results were all normal (AR 232). He claimed he became weak and short of breath upon walking or carrying a shopping bag and complained of right-sided weakness (AR 232). On physical examination, his reflexes were symmetrical, there was no clonus, his plantar reflex was downgoing and his manual strength testing was "very inconsistent" (AR 232). Dr. Wheeling was still of the opinion that English's symptoms were due to fibromyalgia since his physical examination was not consistent with ongoing radiculopathy (AR 232). She opined that she "firmly believe[d]" she was witnessing "symptom magnification" (AR 232). Dr. Wheeling recommended an EMG and nerve conduction study in order to determine if there was any

ongoing denervation (AR 232). She concluded that he needed to either return to Dr. Gilman or obtain an independent second opinion (AR 232).

A November 2003 EMG of English's upper extremities revealed moderately severe right C7 radiculopathy, chronic, and mild radiculopathy at C8 (AR 236). Dr. Wheeling observed that since she did not have access to any preoperative studies, she was unable to tell if the denervation was improved or ongoing (AR 236).

English was seen by Dr. Martin on November 14, 2003 and complained of neck and back pain, as well as right lower extremity weakness (AR 238). An EMG of English's lower extremities conducted on November 21, 2003, revealed findings within normal limits (AR 246). An MRI of his lumbar spine conducted on the same date showed narrowing of the neural foramina at L4-5 bilaterally due to hypertrophic changes, but no focal disc herniations were identified (AR 249).

On December 16, 2003, Dr. Martin noted that English's diagnostic studies indicated issues with his back "still exist," noting that his MRI showed narrowing at L4-5 and lumbar spinal stenosis at L4-5 (AR 287). He anticipated "more problems in the future" (AR 287).

On January 8, 2004, Michael Niemiec, D.O., a state agency reviewing physician, reviewed the medical evidence of record and concluded that English could occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, stand and/or walk at least two hours in an 8-hour workday, sit about six hours in an 8-hour workday, was unlimited in his push/pull ability and could occasionally climb, balance, stoop, kneel, crouch and crawl (AR 251-252).

English underwent physical therapy from January 30, 2004 through March 3, 2004 (AR 260-284). He continued to complain of pain, but upon discharge, his therapist reported there had been some improvements in his range of motion (AR 260). He continued to experience right shoulder pain and was unable to lift above horizontal (AR 260). Because he was only allowed 20 visits per calendar year, English elected to save future visits for a later date (AR 260). He was

discharged with his goals only partially met and was instructed in a home exercise program (AR 260). An orthopedic consult was recommended for further testing of his right shoulder (AR 260).

On March 9, 2004, Dr. Martin recommended an orthopedic consult for English's right shoulder and an MRI (AR 287). However, on March 22, 2004, English was informed by Dr. Martin's office that his orthopedic appointment could be canceled since his x-ray and MRI of his right shoulder were negative (AR 286).

Finally, when seen by Dr. Martin on April 8, 2004, English reported that his pain was activity driven and that he was unable to engage in any activity for more than twenty or thirty minutes (AR 286). Physical therapy reportedly caused more problems but exercises had helped (AR 286). Dr. Martin assessed English with chronic pain syndrome and continued his Darvocet on an as needed basis (AR 286).

At the hearing, English testified that worked at home as a bookkeeper approximately five to ten hours per month until April 2005 and had interviewed for a full time position just prior to his surgery (AR 303). He was able to drive but had difficulty looking over his right shoulder (AR 304). English testified that he did not use an assistive device for walking, was able to walk for approximately one mile, lift ten pounds, stand for twenty minutes and sit for approximately thirty minutes (AR 305-307). He was able to wash dishes, do laundry and mow his lawn, but he took breaks while engaging in such chores (AR 311-312). He was able to attend to his personal needs without assistance, but had trouble buttoning buttons (AR 307; 311). He attended church meetings once a month (AR 312).

English acknowledged that he only took over the counter pain medication since the majority of the time his pain level was a two or three out of a ten (AR 308-309). He claimed that his pain level increased only with activity (AR 309). He was unable to handle stronger pain medication and chose to lie down in order to alleviate his pain (AR 309).

In addition to his testimony, English submitted two statements for the ALJ's

consideration; one from his former employer and one from a former co-worker (AR 101-102; 297). In a statement dated April 7, 2005, Marlene Ferguson, one of English's former co-workers, stated that she had worked with him since 1993 (AR 101). Ms. Ferguson indicated that as time went on, it became "obvious" that he was in a great deal of pain and had to be driven home many times due to severe pain (AR 101). She further stated that after September 2002 he was unable to work in the office at all, although he completed monthly reports from home (AR 101). Finally, Ms. Ferguson noted that she had seen him only two or three times in the past year and each time he appeared to be in pain and had difficulty moving about (AR 101).

In a statement dated April 10, 2005, Frank P. Pollock, III, English's former employer, stated that he had worked with English since 1995 and described English's inability to maintain regular attendance due to his physical impairments (AR 100). He noted that English repeatedly needed to lie down in order to alleviate his pain when at work and at times had to be driven home due to his pain (AR 100). Mr. Pollock described English's difficulty in maintaining even part-time employment (AR 100).

Joseph Kuhar, a vocational expert, also testified at the administrative hearing. The ALJ asked the expert to assume an individual of the same age, education and work experience as English, who was limited to sedentary work with a sit/stand option, with no climbing, crawling, balancing, or kneeling, no repeated overhead reaching with either arm, no frequent pushing or pulling against resistance, and no fast or frequent head rotation (AR 323-324). The expert opined that such an individual could perform his past work as a controller since he did not sit at a computer screen (AR 324). The expert further testified that English had acquired skills that were transferable to the semi-skilled sedentary work as a bookkeeper (AR 324).

Following the hearing, the ALJ issued a written decision which found that English was not entitled to a period of disability or disability insurance within the meaning of the Social Security Act (AR 17-25). English's request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 7-10). He subsequently

filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen,* 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ determined that English's status post anterior cervical decompression and fusion and fibromyalgia were severe impairments, but determined at step

three that he did not meet a listing (AR 19). Despite his impairments, the ALJ found that he was able to perform a limited range of sedentary work with the following restrictions: a sit/stand option at will; no climbing, crawling, balancing or kneeling; no repeated overhead reaching; no frequent pushing or pulling; and no fast or frequent head rotation (AR 19). The ALJ concluded that he could perform his past relevant work as a controller, as well as other work which exists in significant numbers in the national economy (AR 23). The ALJ also concluded that English's statements concerning the intensity, duration and limiting effects of his symptoms were not entirely credible (AR 20). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Although English sets forth a number of errors allegedly committed by the ALJ, fundamentally he argues that the ALJ's decision is not supported by substantial evidence because his opinion does not show a fair consideration of *all* the evidence. We agree. In evaluating a claim for benefits, the ALJ must consider all of the evidence in the case. *Plummer v. Apfel,* 186 F.3d 422, 429 (3rd Cir. 1999). The Third Circuit has also directed that "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence," *Dobrowolsky v. Califano,* 606 F.2d 403, 407 (3rd Cir. 1979), *see also Sykes v. Apfel,* 228 F.3d 259, 266 (3rd Cir. 2000), and explain a rejection of the evidence, *see Schaudeck v. Comm'r of Social Sec. Admin.,* 181 F.3d 429, 435 (3rd Cir. 1999). "Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Sykes,* 228 F.3d at 266 (quoting *Benton v. Bowen,* 820 F.2d 85, 88 (3rd Cir. 1987). Without this type of explanation, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter v. Harris,* 642 F.2d 700, 705-07 (3rd Cir. 1981); *see also Plummer,* 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

While there is no requirement that the ALJ discuss in his opinion every treatment note included in the record, *see Fargnoli v. Massanari,* 247 F.3d 34, 42 (3rd Cir. 2001), the ALJ's

11

opinion in this case failed to discuss the results of English's November 2003 EMG of his upper extremities, which revealed moderately severe chronic right C7 radiculopathy and mild radiculopathy at C8 (AR 236). The ALJ agreed with Dr. Wheeling's November 2003 opinion that English was magnifying his symptoms since his physical examination and complaints were not consistent with ongoing radiculopathy (AR 21). In this regard, the ALJ relied on subsequent nerve conduction studies of English's *lower* extremities, as well as an MRI of his *lumbar* spine, which were reported as normal (AR 21). However, he failed to address the results of English's November 2003 EMG study of his upper extremities which is potentially material to a proper examination of Dr. Wheeling's opinion. Since the ALJ failed to analyze this potentially probative evidence, the case should be remanded for a proper analysis of this evidence. *Burnett v. Comm'r of Social Sec. Admin.,* 220 F.3d 112, 122 (3rd Cir. 2001) (remand appropriate based on ALJ's failure to mention and explain contradictory medical evidence).

      Similarly, the ALJ's opinion does not discuss two statements by English's former supervisor and a co-worker which were submitted by English at the hearing. These statements indicate that English repeatedly needed to lie down in order to alleviate his pain, had to be driven home from work on many occasions due to severe pain and had an inability to maintain regular attendance due to his physical impairments (AR 100-101). The ALJ considered English's testimony but concluded that his statements concerning the intensity, duration and limiting effects of his symptoms on his ability to work were not entirely credible (AR 20). In so finding however, the ALJ did not mention or discuss the impact of these two statements on his decision not to find English fully credible.

      In assessing credibility, the ALJ must consider all of the evidence in the case record, including all non-medical evidence before him. *Burnett,* 220 F.3d at 122. The Commissioner has recognized that other non-medical sources, such as family and friends, may provide information from which inferences and conclusions may be drawn about the credibility of the claimant's statements. *Social Security Ruling ("SSR") 96-7p*, 1996 WL 374186 at *8. Because

these two statements potentially bolster English's credibility, these statements are competent evidence that the ALJ must address in his decision. *See e.g., Proper v. Apfel,* 140 F. Supp. 2d 478, 484 (W.D.Pa. 2001) (ALJ erred in failing to mention witnesses bolstering testimony); *Kuhn v. Barnhart,* 2004 WL 414069 at *13 (E.D.Pa. 2004) (error to make adverse finding with respect to a claimant's credibility without addressing the testimony of witnesses that bolster claimant's credibility). The Third Circuit has made clear that the failure of an ALJ to address evidence prevents a reviewing district court from properly exercising its responsibility under 42 U.S.C. § 405(g) to determine whether a challenged decision of the Commissioner is supported by substantial evidence. *See Fargnoli,* 247 F.3d at 41. Consequently, we find that the ALJ erred in this case in failing to address the submitted statements, and is directed to specifically address this evidence on remand consistent with Third Circuit case law.

## VI. Conclusion

    An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAMUEL L. ENGLISH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 06-19 Erie |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 26th day of April, 2007, and for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 11] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is directed to mark the case closed.

                                                s/ Sean J. McLaughlin
                                                United States District Judge

cm: All parties of record.